IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| BRENT D. BARNES, | ) | |
| | ) | |
| Plaintiff, | ) | 4:18CV3131 |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM** |
| NANCY BERRYHILL, Acting | ) | **AND ORDER** |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————— | ) | |

Plaintiff Brent Barnes brings this action under Titles II and XVI of the Social Security Act, which provide for judicial review of "final decisions" of the Commissioner of the Social Security Administration. 42 U.S.C. § 405(g) (Westlaw 2019).

## I.  NATURE OF ACTION & PRIOR PROCEEDINGS

### A.      Procedural Background

Barnes filed an application for disability benefits on July 7, 2015, under Titles II and XVI. The claims were denied initially and on reconsideration. On November 17, 2017, following a hearing, an administrative law judge ("ALJ") found that Barnes was not disabled as defined in the Social Security Act. (Filing No. 1-1 at CM/ECF pp. 1-11.) On July 20, 2018, the Appeals Council of the Social Security Administration denied Barnes's request for review. (Filing No. 1-2 at CM/ECF pp. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner. *Sims v. Apfel*,

530 U.S. 103, 107 (2000) ("if . . . the Council denies the request for review, the ALJ's opinion becomes the final decision").

## B.    Medical Factual & Opinion Evidence

The material medical evidence related to Barnes's physical impairments is undisputed and is described by the ALJ as follows:

> [T]he record establishes the claimant injured his back in April 2001. An MRI taken in May 2001 revealed large left L5-S1 disc herniation and disc space degenerative change at L4 and L5. (Exhibit 2F/52). After cortisone injections failed to provide relief, Dr. Robert A. Vande Guchte, M.D., performed a left L5-S1 laminotomy, partial discectomy, and decompression of the S1 nerve root. (Exhibit 2F). The claimant participated in physical therapy for several weeks. (Exhibit 2F/42).

> A second MRI scan performed on the claimant's lumbar spine in Oct 2002 revealed mild residual findings of the laminectomy and partial decompression discectomy. (Exhibit 2F/32). Dr. Guchte opined the claimant's symptoms derived from residual S1 nerve root effect and recommended an epidural corticosteroid injection. (Exhibit 2F/32). Later in February 2003, Dr. Guchte performed a repeat left L5-S1 laminotomy (Exhibit 3F/57; 2F/3). Five months after surgery, the claimant described to Dr. Guchte the same degree of symptoms in his lower extremities. Dr. Guchte diagnosed persistent neurogenic pain syndrome. (Exhibit 2F/1). Following the second surgery the claimant underwent a functional capacity evaluation in 2004 (Exhibit 3F/50-56.). Dr. Guchte reviewed FCE and opined its findings suggested a sedentary work environment to, at most, a light work classification. (Exhibit 2F/1).

> In July 2003, claimant was involved in a motor vehicle accident in which his vehicle was struck in the rear end. (Exhibit 3F/48). X-rays of his lumbar spine were negative for acute abnormalities (Exhibit 3F/49). In April 2005, claimant was injured moving boxes inside the back of a pickup truck. (Exhibit 3F/26). A MRI taken in May 2009 revealed post-surgical changes at L5-S1, including epidural fibrosis on the left,

borderline central canal narrowing present at L3-L4 due to spondylitic changes and disc degeneration, as well as scattered areas of degenerative changes at multiple levels. (Exhibit 10F/1). The most recent MRI performed in October 2014 revealed multilevel disc disease in lumbar spine, greatest at L5-S1 level, where there is a broad based disc bulge with left paracentral disc protrusion. (Exhibits 3F/2; 11F/1-2).

In September 2015, Dr. Scott A. McPherson conducted a consultative medical examination. (Exhibit 8F). During the interview, the claimant told Dr. McPherson that he could not sit longer than 30 minutes, stand for more than minutes, or walk more than a block. (Exhibit 8F/1). The claimant also reported urinary incontinence and erectile dysfunction as a result of low back pain. On physical examination, Dr. McPherson noted the claimant's left shoulder injury in 2003 with arthritis and reduced range of motion, which limits his ability to work with hands. (Exhibit 8F/2) The range of motion testing revealed the claimant's shoulder had forward elevation to 110 degrees right, 90 degrees left, abduction 100 degrees right and 80 degrees left. Examiner documented crepitus with manual movement of both shoulders. (Exhibit 8F/3). An MRI of his left shoulder revealed tendinosis/tendinitis changes of distal supraspinatus tendon without identification of a discreet tear. Tendinosis changes of the distal subscapular tendon, but otherwise a negative examination. (Exhibit 4F/1).

The consultative examine[r] also performed range of motion testing on the claimant's lower extremities. Testing revealed hip flexion of 70 degrees right, 30 degrees left, extension of 20 degrees bilaterally, abduction of 20 degrees right, 10 degrees left, adduction, 10 degrees right, 30 degrees left, with internal rotation of 30 degrees right, 20 degrees left, and external rotation, 30 degrees right, 20 degrees left. (Exhibit 8F/6). The claimant's lumbar flexion measured 60 degrees, extension 10 degrees, with 0 degree of lateral flexion bilaterally. (Exhibit 8F/6). The claimant's straight leg raise measured 30 degrees on right, and 10 degrees on left. His lower extremity muscle strength measured 4/5 bilaterally. (Exhibit 8F/6). The examiner also noted the claimant had a normal gait and used no assistive device for ambulation. The examiner diagnosed chronic low back pain, chronic shoulder pain, and history of arthritis of left shoulder. (Exhibit 8F/6).

The record reflects the claimant's most recent physical examination occurred in June 2017. Dr. Guchte documented tenderness to palpation in the lower back, mid back, and upper thoracic region. No muscle spasm was present. He recorded no evidence of spine instability to palpation or manipulation. The claimant's sitting and lying straight leg raises did not produce pain in back region or lower extremities. The femoral nerve stretch test in prone position was negative bilaterally. A lower lumbar compressional maneuver with bilateral active leg raising was negative for reproducing back pain. (Exhibit 18F/2). Lumbar spine imaging revealed chronic collapse of patient's L5-S1 segment with adjacent endplate changes with mild degenerative at L3-L4, L4-L5. (Exhibit 18F/3). Dr. Guchte assessed chronic left S1 radiculopathy, L5-S1 chronic degenerative spondylosis, L4-L5 mild degenerative spondylosis, (Exhibit 18F/3).

Medical records also document the claimant has had four separate lumbar epidural injections with no relief from pain. (Exhibit 27F/1). In July 2017, the claimant saw Dr. Hajj and the record indicates the claimant reported he was not exercising . . . .[1] (Exhibit 27F/1, 4). On physical examination, Dr. Hajj, M.D., documented back pain with range of motion all directions; 5/5 strength proximally and distally in all extremities, and pain inhibition. (Exhibit 27F/3). Dr. Hajj refilled oxycodone 5 mg, and hydrocodone-acetaminophen, gabapentin and carisporodol. (Exhibit 27F/4).

The objective medical evidence of record shows the claimant has chronic collapse of his L5-S1 segment, with L5-S1 chronic degenerative spondylosis, chronic left S1 radiculopathy, and milder L4-L5 degenerative spondylosis. (Exhibit 18F/3). Dr. Guchte has recommended disc fusion surgery as a possible option. (Exhibit 18F/4). The claimant also suffers from tendinitis and tendinosis in his left shoulder (Exhibit 4F). He treats his chronic pain caused by these conditions with opiates, muscle relaxants and ibuprofen. At the hearing, the claimant testified his medications help him "get out of bed" and "complete daily functions."

---

[1]I have deleted language stating that the claimant "was sleeping 6-8 hours per night" because the cited exhibit does not contain such language.

. . . .

As for the opinion evidence, I have considered and given some weight to the opinions of the State agency medical examiners who opined the claimant is capable of performing less than the full range of light work with additional postural, manipulative, and environmental restrictions and limitations, many of which I have incorporated in the residual functional capacity assessment. (Exhibits 1A, 2A, 5A, 6A). The medical non-examiners are familiar with the disability determination process and the Regulations. They based their opinions on a comprehensive review of the record. They supported their opinions with detailed narratives explaining the evidence they relied on in reaching their conclusions. To the extent the residual functional capacity varies from their opinion, the variance is due to new evidence, including the claimant's and vocational expert's testimonies, which were not available to the non-examiners.

I have also considered two opinions of Dr. Kathryn M. Hajj, M.D., a physiatrist. (Exhibits 14F, 21F). In a letter dated March 2015, Dr. Hajj opined the claimant must refrain from straining his shoulder by pushing, pulling, or lifting anything above 10 pounds and must avoid reaching above his head with any kind of weight. (Exhibit 14F/5). Dr. Hajj has treated the claimant and managed his pain medications since 2008, and she is intimately familiar with his medical history. Her opinion is also consistent with the objective medical evidence (Exhibit 4F). Therefore, I have assigned some weight to her opinions. Dr. Hajj also completed a medical questionnaire in June 2017 (Exhibit 21F). She opined the claimant has exhausted his ability to improve with further physical therapy; he cannot maintain a sitting, standing, bending or leaning position for "any length of time," and his variable response to treatment "makes his ability to perform gainfully employed [sic] less likely." (Exhibit 21F/2, 5). While acknowledging Dr. Hajj is a treating source, I have given considerably less weight to these opinions because they are not supported by functional testing, they are vague, and encroach upon an issue reserved exclusively to the Commissioner.

(Filing No. 1-1 at CM/ECF pp. 6-9.)

## C.     Barnes's Activities

As to Barnes's level of activity, the ALJ described the evidence as follows:

> The claimant and his friend, Barry Beruman, also report the claimant engages in activities that are not limited to the extent one would expect in light of the claimant's allegations of disabling pain and physical limitations. (Exhibits 4E, 5E). For example, he performs his own personal care, and he testified he provides care for a disabled person in return for room and board.[2] He prepares simple meals[3], shops for groceries[4], does light housekeeping, and small loads of laundry. He enjoys watching television and going to movies with friends and family. He also enjoys camping and boating,[5] drives, and takes short walks. (Exhibits 4E, 5E, hearing testimony). While the claimant's abilities to engage in these ordinary daily activities is not conclusive proof the claimant is also able to engage in substantial gainful activity, the claimant's capacity to perform these tasks independently is a strong indication that the claimant retains the capacity to perform the requisite physical and mental tasks that are part of everyday basic work activity.

(Filing No. 1-1 at CM/ECF p. 8.)

---

[2]At the hearing before the ALJ, Barnes testified that he cares for his disabled roommate only by "helping her with her lunch . . . [and] making sure that she's awake." (Filing No. 12-2 at CM/ECF p. 39.) To prepare lunch, Barnes "help[s] them get a frozen dinner into their lunch pail, a yogurt, some fruit, a pop." (*Id*. at p. 61.)

[3]At the hearing, Barnes testified that "[m]ost of the meals are microwavable and simple to prepare, so I'm not required to stand for an extensive period of time." (Filing No. 12-2 at CM/ECF p. 51.)

[4]Barnes testified that he "make[s] frequent trips" to the grocery store "so that amount that I'm carrying is—doesn't cause me pain." (Filing No. 12-2 at CM/ECF p. 51.)

[5]Barnes actually testified that he has "not been able to do [his hobbies] for quite some time or the couple that I've tried to do is very limited." (Filing No. 12-2 at CM/ECF pp. 51-52.)

6

**D.** **The ALJ's Conclusions**

Following the five-step sequential analysis for determining whether an individual is "disabled" under the Social Security Act, 20 C.F.R. § 404.1520, the ALJ concluded in relevant part (Filing No. 1-1 at CM/ECF pp. 4-11):

(1)     Barnes has not engaged in substantial gainful activity since November 5, 2010, the amended alleged onset date.

(2)     Barnes's severe impairments of degenerative disc disease, radiculopathy of the bilateral lower extremities, epidural fibrosis, and tendinosis/tendinitis of the left shoulder did not meet or equal the severity of one of the listed impairments under the Act because "the record does not contain evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication. . . . [or] an inability to ambulate effectively." (Filing No. 1-1 at CM/ECF p. 4.)

(3)     Barnes has the residual functional capacity ("RFC") to perform sedentary work[6] with the following restrictions and limitations:

> The claimant can never climb ladders, ropes, or scaffolds. He can no more than occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. He can perform no more than occasional overhead reaching with his upper extremity. He can never use foot controls with his bilateral lower extremities. He can have no concentrated exposure to extreme cold temperatures or workplace hazards, defined as unprotected heights and dangerous moving mechanical parts. He can stand for one

---

[6]The ALJ's opinion states that Barnes has the residual functional capacity to perform "sedentary work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b)." The ALJ erroneously references C.F.R. sections that describe "light work." I assume the ALJ meant to reference 20 C.F.R. §§ 404.1567(a) and 416.967(a), which describe "sedentary work."

hour before needing to sit for 10 minutes before standing again, in addition to normal breaks, without leaving the workstation or work area.

(4)     Barnes's RFC allows him to perform his past relevant work as a telephone customer service representative, a sedentary position. There are also other jobs existing in the national economy that Barnes can perform, such as a charge-account clerk, food and beverage order clerk, and addresser.

(5)     Barnes was not under a disability within the meaning of the Social Security Act from November 5, 2010, through the date of the ALJ's decision.

## II.  ISSUES ON APPEAL

Barnes asserts that the ALJ erred in (1) failing to give controlling weight to the opinions of Dr. Kathryn M. Hajj, Barnes's treating physician; (2) substituting the ALJ's own opinion for those of Barnes's physicians; (3) relying on an RFC that did not incorporate Barnes's "relevant complaints of pain and the side effects of [P]laintiff's many medications on his ability to work as required by SSR 16-3p"; (4) not finding Barnes disabled based on the testimony of the vocational expert ("VE"); and (5) failing to obtain an updated opinion from a medical advisor after 400 pages of medical records were "added to the file after the State agency medical consultants reviewed this case," especially "given the complicated medical issues involved." (Filing No. 21 at CM/ECF p. 3.)

## III.  STANDARD OF REVIEW

The court may reverse the Commissioner's findings only if they are not supported by substantial evidence or result from an error of law. *See Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018); 42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In determining whether evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. If substantial evidence supports the Commissioner's conclusion, the court may not reverse merely because substantial evidence also supports the contrary outcome and even if the court would have reached a different conclusion. *Nash*, 907 F.3d at 1089. The Eighth Circuit has repeatedly held that a court should "'defer heavily to the findings and conclusions of the Social Security Administration.'" *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015) (quoting *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010)).

## IV.  DISCUSSION

### A. <u>Weight Given to Treating and Agency Physicians</u>

#### 1. <u>Treating Physician</u>

Barnes first argues that the ALJ erred in giving only "some weight"—as opposed to "controlling weight"—to the following opinions of Barnes's longtime primary-care treating physician, Dr. Kathryn Hajj: (1) that the variability in Barnes's "good" and "bad" days makes his ability to perform gainful activity less likely (Filing No. 13-10 at CM/ECF p. 3); (2) that Barnes's "disabling pain" is consistent with his physical exam and MRI and x-ray testing (Filing No. 13-10 at CM/ECF p. 4); (3) that

Barnes was incapable of sustaining substantial gainful activity because he has had spinal surgeries in 2001 and 2003 with significant ongoing pain and radiculopathy despite following doctors' treatment recommendations (Filing No. 13-10 at CM/ECF pp. 5-6); and (4) that Barnes cannot maintain a sitting, standing, bending, or leaning position for "any length of time" (Filing No. 13-10 at CM/ECF p. 6).

An ALJ will give a treating physician's opinion controlling weight only if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with the other substantial evidence. *Myers v. Colvin*, 721 F.3d 521, 525 (8th Cir. 2013); *House v. Astrue*, 500 F.3d 741, 744 (8th Cir. 2007); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "[A]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (internal quotation marks and citation omitted). The ALJ is free to reject the opinion of any physician when it is unsupported in the physician's own treatment notes or other evidence of record. *Myers*, 721 F.3d at 525; *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007); *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006).

An ALJ should weigh treating-physician opinions using factors such as the nature and extent of treatment; the degree to which relevant evidence supports the physician's opinion; consistency between the opinion and the record as a whole; whether the physician is a specialist in the area in which the opinion is based; and other factors that support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "Whether granting 'a treating physician's opinion substantial or little weight,' *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000), the commissioner must 'always give good reasons . . . for the weight' she gives, 20 C.F.R. § 416.927(d)(2)." *Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014).

The ALJ accorded "some weight" to Dr. Hajj's opinion (Filing No. 13-7 at CM/ECF p. 6) that Barnes must refrain from straining his left shoulder by pushing, pulling, or lifting anything above 10 pounds and must avoid reaching above his head with any kind of weight because "Dr. Hajj has treated the claimant and managed his pain medications since 2008, and she is intimately familiar with his medical history. Her opinion is also consistent with the objective medical evidence." (Filing No. 1-1 at CM/ECF p. 9.) The ALJ then accorded "considerably less weight" to Dr. Hajj's opinions (Filing No. 13-10 at CM/ECF pp. 3-6) that Barnes has exhausted his ability to improve with further physical therapy; "[h]e cannot maintain a sitting, standing, bending, or leaning position [for] any length of time"; and his variable response to treatment "makes his ability to perform gainfully employed [sic] less likely" because such opinions were "not supported by functional testing, they are vague, and encroach upon an issue reserved exclusively to the Commissioner." (Filing No. 1-1 at CM/ECF p. 9.)

The ALJ was justified in giving less weight to Dr. Hajj's opinion that Barnes was "less likely" to be gainfully employed because that opinion was a legal conclusion to be reached by the Commissioner. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) (doctor's conclusory statement "that [claimant's] problems would make it difficult for him to hold any significant employment" was "an inappropriate legal conclusion"); *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002) (a treating physician's "statements that a claimant could not be gainfully employed are not medical opinions but opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner]" (internal quotation marks and citations omitted)).

However, the ALJ was incorrect in giving "considerably less weight" to Dr. Hajj's opinions that Barnes had exhausted his ability to improve with further physical therapy and that Barnes could not maintain a sitting, standing, bending, or leaning position "for any length of time." While these opinions were expressed in letter and questionnaire formats, they were based on Dr. Hajj's treatment of Barnes since 2008

(Filing No. 13-10 at CM/ECF p. 2), the voluminous records describing such treatment (Filing Nos. 13-4, 13-5, 13-6 at Bates pp. 611-779; Filing No. 13-7, 13-8 at Bates pp. 790-844; Filing No. 13-10 at CM/ECF pp. 2-6, 20-41), and Dr. Hajj's specific incorporation of, and reliance on, the findings and records of Dr. Vande Guchte (Filing No. 13-1, Ex. 1F, at CM/ECF pp. 5-57; Filing No. 13-1, Ex. 2F, at CM/ECF pp. 5-58; Filing No. 13-9 at CM/ECF pp. 25-59), Lincoln Radiology, and Bryan Memorial Hospital.[7]

On her Medical Source Statement questionnarie, Dr. Hajj referred to and described Barnes's two spinal surgeries in 2001 and 2003, noted Barnes's repeated attempts at physical therapy that offered only "minor relief," listed his multiple pain medications with dosage information, and referred to Dr. Vande Guchte's opinion that while future lumbar surgery could not be ruled out, "at this time this is the best we can expect without any further surgery." (Filing No. 13-10 at CM/ECF p. 3.) Dr. Hajj then detailed Barnes's chronic symptoms of pain and their consistency with what had been found "on physical exam, MRI and XRays" and with the progress notes of Dr. Vande Gutche and "various physical therapists." (Filing No. 13-10 at CM/ECF p. 4.)

Dr. Hajj's opinions cannot be considered conclusory or "vague," as the ALJ stated, because the doctor's opinions were accompanied by a discussion of reasons for her opinions and were based on her extensive treatment history with Barnes, her

---

[7]Dr. Hajj's Medical Questionnaire stated:

I would like to defer to Dr. Van de Guchte in that I would agree with his findings as well.
MRI Lumbar spine Lincoln Radiology 5-4-2009
MRI Lumbar spine Bryan Memorial Hosp: 10-28-2014
XRays of lumbar spine through Bryan Hosp and those of Dr. Van de Guchte's office

(Filing No. 13-10 at CM/ECF p. 2.)

records memorializing such treatment, other physicians' and physical therapists' treatment of Barnes, and specifically identified radiological test results. *See Wildman*, 596 F.3d at 964 (ALJ properly discounted physician's opinion as conclusory when it consisted of three checklist forms, cited no medical evidence, and provided "little to no elaboration"); *Cox v. Barnhart*, 345 F.3d 606, 609 (8th Cir. 2003) (if physican's conclusory letter "were the only available record from Dr. Van Alstine, the ALJ would have been correct in giving it little weight due to its conclusory nature. This letter, however, is only one part of a larger medical record supplied by Dr. Van Alstine and Cox's other treating physicians").

Dr. Hajj's opinion that Barnes could not maintain a sitting, standing, bending, or leaning position "for any length of time" was supported by her treatment notes and other evidence in the record indicating that, by the time of the hearing, the most Barnes could sit or stand without taking a break was 30 minutes. (Filing No. 13-7 at CM/ECF pp. 1-45 (office treatment records from Dr. Hajj from June 26, 2014, to Oct. 24, 2016, repeatedly indicating that work injury, which caused second lumbar spine surgery, "really . . . took a toll on his lumbar spine and low back. Brent just never recovered from the second injury . . . that really caused his chronic low back disability. He has been on chronic pain management since"); Filing No. 13-10 at CM/ECF p. 23 (Dr. Hajj noting "Back pain with movement in all directions" on Apr. 18, 2017); Filing No. 13-8 at CM/ECF p. 38 (Barnes indicating on patient questionnaire at Midwest Neurosurgery & Spine Specialists on Feb. 20, 2017, that pain prevents him from sitting or standing more than 30 minutes); Filing No. 12-7 at CM/ECF p. 41 (Barnes changing positions multiple times during course of hearing); Filing No. 13-3 at CM/ECF p. 77 (Barnes indicating to Dr. McPherson on Sept. 22, 2015, that he could not sit longer than 30 minutes, could not stand longer than 45 minutes, and "has very little comfort in any position").)

For this and other reasons discussed below, I will remand this matter to the ALJ to reconsider the weight given to Dr. Hajj's opinions that Barnes has exhausted his

ability to improve with further physical therapy and that he cannot maintain a sitting, standing, bending, or leaning position for any length of time.

## 2. Agency Physicians

Barnes also argues that the ALJ should not have given "some weight" to the opinions of the state-agency medical examiners (Filing No. 12-3 at Ex. 1A, 2A, 5A, 6A) because they rendered their opinions without the benefit of any of Dr. Hajj's extensive records on Barnes's diagnoses and care. (Filing No. 21 at CM/ECF p. 10.) Defendant counters that the agency physicians noted they requested Dr. Hajj's records in August 2015, but were "unable to get records from the claimant['s] PCP Dr Hajj" (Filing No. 12-3 at CM/ECF pp. 7, 18) even though Barnes obtained an attorney a month before one of the agency physicians rendered his opinion. (Filing No. 23 at CM/ECF p. 9.)

A deficiency in the medical records reviewed by a consulting physician simply goes to the weight to be given to the consultant's resulting opinion. "[T]he opinion of a nonexamining consulting physician is afforded less weight if the consulting physician did not have access to relevant medical records . . . ." *McCoy v. Astrue*, 648 F.3d 605, 616 (8th Cir. 2011); *Wildman*, 596 F.3d at 967 (when evaluating nonexamining source's opinion, ALJ must evaluate degree to which opinion considered all of the evidence pertinent to the claim, including opinions of treating sources); 20 C.F.R. § 404.1527(c)(3) (the weight given to opinions of nonexamining sources depends upon "the degree to which these medical opinions consider all of the pertinent evidence in your claim, including medical opinions of treating and other examining sources").

Here, the ALJ was well aware the agency physicians did not have access to Dr. Hajj's records and therefore properly gave only "some weight" to their opinions after considering all of the evidence, stating that "[t]o the extent the residual functional capacity varies from their opinion, the variance is due to new evidence, including the

claimant's and vocational expert's testimonies, which were not available to the non-examiners." (Filing No. 1-1 at CM/ECF p. 8.)[8] Therefore, the ALJ properly accounted for the fact that the agency physicians did not consider the records of Barnes's treating physician, and I am not persuaded by Barnes's argument otherwise.

## B.    Substituting ALJ's Opinion for Physicians' Opinions

Barnes next argues that the ALJ substituted his opinion for his physician's opinions when the ALJ (1) improperly included in his hypothetical question to the vocational expert ("VE") the ability to "stand for an hour before needing to sit for ten minutes before standing again, in addition to the normal breaks in an eight-hour day[] . . . ." (Filing No. 12-2 at CM/ECF p. 65); and (2) erroneously referenced a July 14, 2017, office note from Dr. Hajj that allegedly said that Barnes was sleeping six to eight hours per night, when the cited exhibit did not contain such language and the record instead indicated that Barnes slept between three to six hours per night. I construe Barnes's argument to be that the ALJ's finding that he could perform sedentary work with certain limitations was not supported by substantial evidence because it was based on the VE's response to an erroneous and incomplete hypothetical question.

### 1.    Hypothetical Question

The ALJ concluded that Barnes has the RFC to perform sedentary work with additional restrictions and limitations, including Barnes's ability to "stand for one hour before needing to sit for 10 minutes before standing again, in addition to normal breaks, without leaving the workstation or work area." (Filing No. 1-1 at CM/ECF pp.

---

[8]Plaintiff's complaints about the weight accorded the agency physicians' opinions is curious because the ALJ did not adopt their conclusion that Barnes was capable of light work. (Filing No. 12-3 at CM/ECF pp. 11, 22, 36, 48.)

4-5.) The ALJ then included this limitation in his hypothetical questions to the VE. (Filing No. 12-2 at CM/ECF p. 65.)

"The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (internal quotation marks and citation omitted). So long as the ALJ has reason to do so, the ALJ "may exclude any alleged impairments that [he] has properly rejected as untrue or unsubstantiated." *Perkins v. Astrue*, 648 F.3d 892, 902 (8th Cir. 2011) (internal quotation marks and citation omitted); *Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005) ("Discredited complaints of pain, however, are properly excluded from a hypothetical question so long as the ALJ had reason to discredit them."); *Harvey v. Barnhart*, 368 F.3d 1013, 1016 (8th Cir. 2004) ("The fact that the ALJ omitted from his hypothetical questions those aspects of [the claimant's] subjective complaints that the ALJ considered non-credible does not render the questions faulty.")

Here, the ALJ failed to cite, much less discuss, any evidence supporting or suggesting the "one-hour" standing limitation, nor does the Defendant refer to such evidence in its brief. (Filing No. 23.) To the contrary, and as mentioned above, the record contained the uncontradicted opinion of Barnes's treating physician that Barnes could not sit or stand "for any length of time" and Barnes's indications on patient questionnaires at Midwest Neurosurgery & Spine Specialists in 2017 and Dr. McPherson's office in 2015 that he could not sit longer than 30 minutes or stand longer than 30-45 minutes. Further, the ALJ personally witnessed Barnes "standing on a couple of occasions . . . during [the] hearing" and testifying that he cannot sit or stand for longer than 30 minutes at a time due to the pain. (Filing No. 12-2 at CM/ECF pp. 49-50.) The ALJ failed to explain why the 30-minute standing and sitting limitation, which is supported by the record, was not included in the RFC and in the ALJ's hypothetical questions to the VE instead of the one-hour standing limitation, which is not substantially supported by the record as a whole.

Because the ALJ posed an improper hypothetical to the VE, the VE's testimony that there were significant numbers of sedentary jobs that Barnes could perform despite his limitations does not constitute substantial evidence supporting the ALJ's determination that Barnes is not disabled. *Collins v. Astrue*, 648 F.3d 869, 872 (8th Cir. 2011) ("Testimony from a vocational expert is substantial evidence only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." (internal quotation marks and citation omitted)); *Guilliams*, 393 F.3d at 804; *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) ("Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision." (internal quotation marks and citation omitted)).

## **2. Erroneous Description of Doctor's Note**

In order to constitute substantial evidence, a VE's testimony must be "based on a hypothetical that accounts for all of the claimant's proven impairments." *Buckner v. Astrue*, 646 F.3d 549, 561 (8th Cir. 2011) (internal quotation marks and citation omitted). "[A]n ALJ may omit alleged impairments from a hypothetical question posed to a vocational expert when . . . the record does not support the claimant's contention that his impairments significantly restricted his ability to perform gainful employment." *Buckner*, 646 F.3d at 561 (internal quotation marks and citations omitted).

Here, the ALJ misrepresented the contents of a treatment note from Barnes's treating physician regarding Barnes's nightly sleep patterns; failed to consider or discuss Barnes's pattern of only sleeping between three and six hours per night due to pain and other side effects of his conditions; and did not mention Barnes's sleep deprivation in his hypothetical to the VE. Nor did the ALJ expressly discount Barnes's claim that he only sleeps between three and six hours per night due to his symptoms.

Specifically, the ALJ's opinion misrepresents a July 2017 treatment note from Barnes's treating physician by characterizing the treatment note as stating that Barnes was sleeping 6-8 hours per night. (Filing No. 1-1 at CM/ECF p. 7 (ALJ opinion referencing Ex. 27F/1, 4); Filing No. 13-11 at CM/ECF pp. 2-5 (July 2017 treatment note by Dr. Kathryn Hajj).) In actuality, the treatment note cited by the ALJ contains no reference whatsoever to the number of hours Barnes was sleeping at night, and the record consistently and repeatedly references Barnes's pattern of getting between three to six hours of sleep per night dating back to 2003. (Filing No. 12-6 at CM/ECF p. 36 (Plaintiff's Daily Activities and Symptoms Report dated Sept. 1, 2015) ("On a good day I will get 5 to 6 hours of interrupted sleep, but most nights I get 3 to 4 hours . . . ."); Filing No. 12-2 at CM/ECF p. 59 (Hearing Transcript from Aug. 11, 2017) ("on a good night, I get about six hours sleep. On a bad night, it's about four."); Filing No. 13-1 at CM/ECF p. 14 (May 7, 2003, Neurology Associates questionnaire filled out by Barnes indicating three to six hours of sleep per night); Filing No. 13-8 at CM/ECF pp. 16 & 19 (treatment notes dated March 3 and July 14, 2016, from Consultants in Infectious Disease, LLC, indicating Barnes was sleeping four to six hours per night).)

When considered with the facts that (1) Plaintiff was asked to resign from a prior sedentary job because he was falling asleep on the job[9]; (2) Barnes has been prescribed, and takes, heavy doses of pain medication which cause drowsiness[10]; and

---

[9]Filing No. 12-2 at CM/ECF pp. 52-53 (testimony at hearing before ALJ that Barnes was asked to resign from former sedentary job answering and making telephone calls because he "had instances where I was falling asleep during phone calls and it was brought to my attention on a couple of occasions that they recorded phone calls and the individual actually asked if I was sleeping").

[10]Filing No. 12-2 at CM/ECF pp. 58-59, 61 (current medications include hydrocodone, oxycodone, Soma (brand of carisoprodol), and gabapentin; discussing "the fog" Barnes experiences from such pain medication); Filing No. 13-11 at CM/ECF pp. 5-6 (listing Barnes's medications as of July 14, 2017, including 350 mg of carisoprodol 4 times per day, up to 10 mg of oxycodone every 4-6 hours daily, and

(3) the VE opined at the hearing that "the fatigue can . . . cause a person to lose a job if it's uncontrollable,"[11] the ALJ's failure to mention Barnes's poor nightly sleep patterns (and instead misrepresenting the hours per night Barnes sleeps) cannot be characterized as a simple "deficiency in opinion-writing technique" that "had no bearing on the outcome of [Barnes's] case." *Buckner*, 646 F.3d at 560. Rather, this matter must be remanded with instructions to the ALJ to consider Barnes's inability to sleep more than three to six hours per night in formulating his hypothetical question to the VE.

## C.  Relying on RFC That Failed to Include Complaints of Pain & Side Effects of Medication

Barnes next argues that the ALJ's finding that Barnes is not disabled was not based on substantial evidence because it was not based on an RFC which incorporated Barnes's complaints of pain and the side effects of his many medications on his ability to work. (Filing No. 21 at CM/ECF p. 12.)

When evaluating a claimant's subjective complaints of pain, the "ALJ must consider all of the evidence, including objective medical evidence, the claimant's work history, and evidence relating to . . . (i) the claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's pain; (iii) precipitating and aggravating factors; (iv) the dosage, effectiveness, and side effects of medication; and (v) the claimant's functional restrictions." *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017).

Here, the ALJ throughly discussed the medical evidence and Barnes's daily activities that he believed were inconsistent with the "intensity, persistence and

---

up to 20 mg of hydrocodone every 4-6 hours per day, all of which can cause drowsiness, *see* [Prescribers' Digital Reference](Prescribers'%20Digital%20Reference)).

[11]Filing No. 12-2 at CM/ECF p. 68.

limiting effects" of Barnes's alleged pain. (Filing No. 1-1 at CM/ECF pp. 6-7.) However, the ALJ failed to mention or discuss the dosage, effectiveness, and side effects of Barnes's medications on his ability to work, other than making a passing reference to "the possible side effects of medications" as a reason for Barnes to avoid unprotected heights and dangerous, moving mechanical parts. (Filing No. 1-1 at CM/ECF p. 8.)

SSR 16-3P requires consideration of the "type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms" unless "there is no information in the evidence of record regarding" this factor, in which case the ALJ need not "discuss that specific factor in the determination or decision because it is not relevant to the case." Soc. Sec. Ruling 16-3P, *Titles II & XVI: Evaluation of Symptoms in Disability Claims*, SSR 16-3P (S.S.A. Oct. 25, 2017). Further, SSR 96-8P requires that an ALJ's RFC assessment be based on "*all* of the relevant evidence in the case record, such as . . . [t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., . . . side effects of medication) . . . ." Soc. Sec. Ruling 96-8P, *Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, SSR 96-8P (S.S.A. July 2, 1996) (emphasis in original). *See also* 20 C.F.R. § 404.1529(c)(3)(iv) ("Factors relevant to your symptoms, such as pain, which we will consider include . . . [t]he type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms . . . .").

In this case, the record is replete with documentation of the side effects caused by Barnes's many medications. At the time of the administrative hearing, Barnes was prescribed and taking several daily doses of hydrocodone, oxycodone, Soma, and gabapentin for back pain. (Filing No. 12-6 at CM/ECF p. 90; Filing No. 13-10 at CM/ECF p. 5; Filing No. 12-7 at CM/ECF p. 47). As a result of using these medications, Barnes has experienced significant fatigue and dizziness. (Filing No. 13-2 at CM/ECF p. 51; Filing No. 13-3 at CM/ECF p. 35; Filing No. 13-4 at CM/ECF pp. 17, 21, 23, 57; Filing No. 13-7 at CM/ECF pp. 13, 15, 17, 20, 27; Filing No. 13-9

at CM/ECF p. 33.) Barnes also testified that his medications made it difficult for him to focus and concentrate on assigned tasks, resulted in "mental fog" at work, and caused him to fall asleep while performing a prior sedentary job, which resulted in his forced resignation. Barnes also testified that his pain medications cause constipation (Filing No. 13-7 at CM/ECF pp. 5, 8, 23) and urinary/fecal incontinence (Filing No. 13-3 at CM/ECF p. 77), the latter of which required accommodations at a previous job. (Filing No. 12-7 at CM/ECF p. 44).

In light of this evidence, the ALJ's RFC assessment was bound to include consideration and discussion of the types, dosages, effectiveness, and side effects of Barnes's medication. Because the ALJ's opinion does not indicate that these factors were evaluated and incorporated into Barnes's RFC and included in the hypothetical question to the VE, this matter must be remanded for such consideration.

## **D.** **Not Finding Disability Based on VE's Testimony Regarding Absences**

Barnes next argues that the ALJ erred in not finding him disabled based on the VE's testimony in response to one of the ALJ's hypotheticals:

> Q      All right, finally, the hypothetical individual has the same limitations as in hypotheticals 1 and 2, but would also likely be missing at least two days of work a month, are there any jobs that hypothetical individual could perform in the national economy?
>
> A      No, they would not be sustainable.
>
> Q      And why is that?
>
> A      That's about the cutoff. Some employers might dismiss a person for one unexcused absence, but two and on, they definitely do.

(Filing No. 12-2 at CM/ECF pp. 66-67.) Despite having posed this question to the VE, the ALJ did not include work absences in concluding that Barnes could perform such

sedentary jobs as charge-account clerk, food and beverage order clerk, and addresser. (Filing No. 1-1 at CM/ECF p. 10.)

Barnes claims that the ALJ erred in not relying on the VE's testimony regarding work absences because the record contained evidence that Barnes's past employment was fraught with multiple absences due to his impairments. Pointing to his pay stubs from the latter portion of his part-time employment with the Nebraska Department of Labor (Filing No. 12-5 at CM/ECF pp. 33-52 (pay stubs showing amount of vacation, sick, and holiday leave taken from November 3, 2014, to July 26, 2015); Filing No. 21 at CM/ECF pp. 16-17 (tabular summation of leave taken from Nov. 2014 to July 2015)), Barnes claims that "in the time leading up to his departure, where he worked 4 hours per day, he regularly missed multiple days of work every two[-]week pay period." (Filing No. 21 at CM/ECF pp. 16-17.)

The pay stubs on which Barnes relies, and which were presented to the ALJ, show that out of 38 weeks of part-time work (totaling 760 hours of scheduled work time), Barnes took 109 hours of vacation and sick time, of which 80 percent was due to his impairments. (Filing No. 12-2 at CM/ECF p. 55 (Barnes's testimony to ALJ that 80 percent of sick and vacation leave taken at Department of Labor from November 2014 to July 2015, as represented by paystubs in Ex. 7D, was necessitated by his impairments).) Therefore, Barnes took 87.2 hours off in 38 work weeks due to his impairments, which averages out to 2.29 hours of time off work each week, or 9.94 hours off per month.[12] Because Barnes worked four-hour days, he averaged more than two work days off per month due to his impairments.

The ALJ gave no explanation for not adopting the VE's testimony that a hypothetical employee who would be missing two days of work each month due to his impairments could not perform any jobs in the national economy, especially when the

---

[12]Thirty-eight weeks is 73 percent of a 52-week year, which equates to 8.77 months. Dividing 87.2 hours by 8.77 months equals 9.94 hours per month.

above-cited pay stubs supported a history of such absences in Barnes's case. (Filing No. 12-5 at CM/ECF pp. 33-52 (Ex. 7D in record before ALJ).) "[T]he ALJ is free to accept, in whole, in part, or not at all, the VE's opinion at step four *so long as* the ALJ explains why the VE's opinion is treated the way the ALJ treats it." *Banks v. Massanari*, 258 F.3d 820, 828 (8th Cir. 2001) (emphasis added). Because the ALJ failed to explain his apparent rejection of the VE's testimony in this regard, this matter must be remanded for consideration and discussion of such testimony. *Banks*, 258 F.3d at 828; *see also Dickey v. Colvin*, 74 F. Supp. 3d 1118, 1133 (N.D. Cal. 2014) (case remanded for payment of benefits due to multiple errors, including ALJ's failure to explain why finding of non-disability was warranted when VE testified that 45 minutes of unscheduled breaks would not be tolerated by any employer); *Dawdy v. Astrue*, No. C 10-4063, 2012 WL 176576, at *5 (N.D. Iowa Jan. 20, 2012) (remand directing ALJ to consider VE's testimony that an individual who misses two or more days of work per month on unscheduled basis would not be competitively employable); *Griffin v. Massanari*, 75 Soc. Sec. Rep. Serv. 284, 2001 WL 1064476 (N.D. Ill. 2001) (reversing and remanding when ALJ found claimant not disabled and capable of performing light work and ignored VE's testimony that "competitive employment" was not possible for a person who must miss work at least once a week due to pain or suffers at least two one-half-hour lapses in concentration each day due to side effects of medication without discussing reason for ignoring such testimony, such as incredibility of claimant's complaints of pain and side effects of medication).

## E.     Failing to Get Opinion from Medical Advisor After Addition of 400 Pages of Medical Records

Finally, Barnes argues that the ALJ erred in not obtaining an updated opinion from a medical advisor after 400 pages of medical records from Barnes's treating physician, Dr. Hajj, were "added to the file after the State agency medical consultants reviewed this case." (Filing No. 21 at CM/ECF p. 18.) Barnes argues that SSR 96-6P requires the ALJ to obtain an updated medical opinion from a medical expert when "additional medical evidence is received that in the opinion of the administrative law

judge . . . may change the State agency medical . . . consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." Soc. Sec. R. 96-6P, *Titles II & XVI: Consideration of Admin. Findings of Fact by State Agency Med. & Psychological Consultants & Other Program Physicians & Psychologists at the Admin. Law Judge & Appeals Council*, SSR 96-6P (S.S.A. July 2, 1996) (Westlaw 2019).

However, this language in SSR 96-6P refers to "obtaining opinions . . . regarding equivalence to listings in the Listing of Impairments . . . ." *Id.* (under "Purpose"). Barnes has not made an argument that he has a presumptively disabling impairment at step three of the disability process, which involves determining if he has an impairment that is of a severity to meet or medically equal the criteria of an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (a "listing"). Barnes does not mention a specific listing, nor has he offered any argument about meeting or equaling a listing. Because Barnes has waived any step-three argument, he has also waived his argument regarding any investigative duty related to step three. *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005) (rejecting claimant's "listing" argument for failure to discuss it; "We reject out of hand [the claimant's] conclusory assertion that the ALJ failed to consider whether he met listings 12.02 or 12.05C because [the claimant] provides no analysis of the relevant law or facts regarding these listings.").

## V.  CONCLUSION

This matter must be remanded to the Commissioner for further proceedings. On remand, the ALJ must: (1) reconsider the weight given to Dr. Hajj's opinions that Barnes has exhausted his ability to improve with further physical therapy and that he cannot maintain a sitting, standing, bending, or leaning position for any length of time; (2) formulate a RFC and provide the VE with a hypothetical question that contains a standing and sitting limitation that is supported by the evidence; (3) consider Barnes's inability to sleep more than three to six hours per night in formulating hypothetical questions to the VE; (4) evaluate the types, dosages, effectiveness, and side effects of

Barnes's medication on his ability to work and incorporate this factor into Barnes's RFC and in hypothetical questions to the VE; and (5) reconsider—and discuss if rejected—the VE's testimony that an individual who misses two or more days of work per month could not perform any jobs in the national economy.

Accordingly,

IT IS ORDERED:

1.      Plaintiff's Motion for Order Reversing the Commissioner's Decision (Filing No. 20) is granted.

2.      Defendant's Motion for an Order Affirming the Commissioner's Decision (Filing No. 22) is denied.

3.      The Commissioner's final decision is reversed pursuant to sentence four of 42 U.S.C. § 405(g), and this cause is remanded to the Commissioner for further proceedings in accordance with this Memorandum and Order.

4.      Judgment will be entered by separate document.

DATED this 3rd day of June, 2019.

                                        BY THE COURT:

                                        s/ *Richard G. Kopf*
                                        Senior United States District Judge